*Decisions will be entered under Rule 50.*

PAGE OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos: 90515, 95674, 96186.   Promulgated April 26, 1940.

*James P. Quigley, Esq.,* and *C. J. McCarthy, Esq.,* for the petitioner.

*E. O. Hanson, Esq.,* and *Thomas H. Lewis, Jr., Esq.,* for the respondent.

954

OPINION.

Leech: Petitioner introduced no evidence and made no contentions on brief as to the so-called "management fee" of $16,800 nor as to the $147 paid on account of a capital stock tax. Having recourse to the usual presumption of correctness, respondent's actions in these two respects are sustained.

Of the issues remaining for decision, the first is whether petitioner is entitled to a deduction of the interest on the four subordinate notes,

which is claimed to be deductible in each of the taxable years to the extent of $120,000. A necessary preliminary inquiry here is whether petitioner accounted on the accrual basis, for, since the interest was never paid, the only theory upon which petitioner may have this deduction is that it used the accrual method of accounting. Respondent did not question petitioner's accounting methods in his deficiency notice or in his answer. He raises this issue for the first time on brief.

This record, we think, supported by the testimony of the bookkeeper who kept petitioner's books, indicates the petitioner was properly on the accrual basis during the taxable years and was entitled to compute its income for those years on that system of accounting. Accordingly, we have found that as a fact. The minor deviations apparent here are not sufficient to affect that fact or its propriety, so long as income is accurately reflected. *Niles Bement Pond Co.* v. *United States*, 67 Ct. Cls. 693; 281 U. S. 357; *M. D. Rowe*, 7 B. T. A. 903. And there is nothing in this record that indicates otherwise than that this system reflected the income of the taxpayer reasonably accurately. Cf. *Helvering* v. *Jane Holding Corporation*, 109 Fed. (2d) 933. Since this same system of accounting and returns thereon had been used ever since petitioner's organization, petitioner did not require the approval of the Commissioner to make a change, since no change, in fact, was made.

The evidence as to petitioner's accounting basis discloses that proceeds from sales of oil, repairs, and general expenses of operation were accounted for only as realized or paid. But these oil sales were made to a pipe line company and were paid practically when accruable, i. e., when delivered to the pipe lines of the purchaser. So it was with labor costs, which made up the greater part of the repair and general expense items. The book of original entry, petitioner's journal, shows the computation of profit and loss, the closing entries for each year in which are reflected the deferred items here in question, and the balance sheets attached to the returns show that such returns were all made upon this accrual basis. The interest on notes and mortgages, taxes, insurance, salaries, and drilling costs were all accrued. Since the petitioner was using the "flooding" method for oil production, the oil and water wells drilled were permitted to stand for 12 to 18 months before production began. The costs of the drilling of these wells were billed to petitioner and then accrued as expenses, as each well was completed. It may be that some ambiguity exists as to whether these costs were then properly accruable, since they were to be paid, at least primarily, from oil produced from such oil wells. However, it is noted that these wells were all in a field which had produced oil over a long period of time and, as a prac-

tical matter, production was not in doubt. But even if not properly accruable until oil was actually produced from the wells, the significant fact remains that the costs for each well were thus accrued. It is the fact of accrual, alone, which is now denied by the respondent. The right to so accrue does not seem important because the right to deduct such accrued items is not questioned. After examination of the books of the petitioner for each year since its organization, respondent has permitted the deduction of these items as and when so accrued, as well as other accrued items, including interest on the development notes. He has not attacked, and does not here attack, the propriety of any of those deductions, although the items they represent had not been paid.

In his deficiency notice respondent disallows the claimed deduction for interest on the four subordinate notes only because "the essential element of cost of the property to you has not been established, nor has any detail with respect to the notes been submitted which justifies the interest accrual as an allowable deduction from income." We take it that respondent was contending that the acquisition of the Ralph property by petitioner was direct from the Associated Producers Co., with Diament and Page merely as agents of petitioner in procuring title, and, accordingly, no consideration could be recognized except that of the $750,000 passing to the Associated Producers Co.

If this was the basis of the disallowance, the evidence not only contains nothing in support of respondent's assumption, but, we think, convincingly disproves it. It is established that petitioner did not acquire all that Diament received from the Associated Producers Co. The former reserved a one-eighth carried interest in conveying to Page, while the conveyance by the latter to petitioner included the 100-acre lease acquired by him from Diament for a consideration of $50,000. In addition to this, it is shown that, subsequent to the acquisition of these properties from Diament, Page attempted unsuccessfully to dispose of them to other interests and only upon the failure of these efforts were they conveyed to petitioner.

However, respondent contests the propriety of the deductions of interest upon two other grounds: First, that they were not bona fide obligations, intended to be paid, but merely the medium of obtaining a deduction for interest, and, second, that if bona fide obligations they are not of the character which permitted of the deduction of interest accrued in the taxable years before us.

In support of the first contention, respondent calls attention to the fact that the Ralph property was sold by the Associated Producers Co. for $750,000 and insists that this establishes its value as not in excess of that amount. It is urged that this fact negatives

the bona fides of a transaction in which it is claimed the property was acquired by petitioner for a consideration in excess of $2,000,000. It is further argued by respondent that the proof is incomplete as to the total consideration paid by petitioner, in that the offer made by Page and accepted by petitioner was to convey the Ralph and Diament properties for $2,000,000 in subordinate notes, another note for $161,650, cash in the sum of $16,000, and the assumption of mortgages of $600,000 and $37,500, and that the only proof as to payment is the issuance of the $2,000,000 in subordinate notes and the assumption of the $600,000 mortgage on the Ralph property.

As to the first argument, it is quite true that the consideration paid the Associated Producers Co. for the Ralph property was $750,000, but a reasonable value for the property very largely in excess of that price is, we think, clearly established. Witnesses, qualified by substantial experience in oil properties and their market values in that section, testified to a value in excess of $3,000,000 for the property. The Diament lease on 100 acres, included in the sale to petitioner, had been bought for $50,000, or $500 per acre. This latter property lay within the Ralph property and at the same rate would indicate a value, for the latter, in excess of $5,000,000. In addition to this, there were on the Ralph property, in excess of $250,000 in equipment and approximately 200 producing wells. There is, in our opinion, ample evidence to sustain our finding of a value of $3,000,000 for the latter property. In view of the record, the acquisition of this property by Page and his associates for $750,000 is easily understood. It had been operated by the Associated Producers Co. under a method which had not proved successful. Page recognized its possibilities if the flooding method of production was used. The correctness of the estimate of value is well supported by the record of oil production under petitioner's operation.

As to the lack of complete proof of the payment of the full consideration appearing in the offer and acceptance, it is noted that the only item of that consideration, the actual payment of which was questioned, was the $2,000,000 in subordinate notes. But there is direct proof of their issuance. The record is silent as to the payment of the other items of the consideration. In that situation we can not find that these other items were not paid. The witnesses with knowledge of the facts were examined and cross-examined, and were merely interrogated as to the issuance of the subordinate notes. Under these conditions, we think, the absence of evidence of payment of the consideration other than the issuance of the deferred notes is of little significance.

It is argued that the evidence in connection with the payment of the purchase price for the smaller property bought by Page from Diament conflicts. Page testified that he paid the entire consideration of $50,000, borrowing this amount from Shay. But when he offered the property to petitioner, he notified petitioner that it was subject to a mortgage for $37,500. He also entered this sum on his books as a note payable. His proposal to the petitioner called. attention to the existence of this mortgage, though it did not ask that petitioner assume it. Petitioner did not assume this mortgage.

In view of the lapse of at least ten months between the date of Page's proposal to petitioner and the execution of the deed including this property, it is wholly possible that Page paid this mortgage before the execution of that deed. That being so, his testimony that he paid the entire $50,000 consideration to Diament for the smaller property stands unimpeached. Though of relative unimportance, that payment has, therefore, been found as a fact.

This leaves for consideration the respondent's contention that the subordinate notes, if bona fide obligations of petitioner, were not of a character to support a deduction for interest accrued. He contends that notes which are payable as to principal and interest only out of profits do not represent a liability for either unless and until there are such profits realized and that prior to such time interest may not be accrued as a deduction from income. We agree fully with the principle, but here the factual premise, essential to its application, is lacking. We find nothing in the record to sustain respondent's assertion that the notes and interest were payable only from earnings. There is no such limitation of liability in the notes themselves or in the offer and acceptance under which they were issued, nor is there any evidence that an agreement or understanding to that effect existed. They were demand notes bearing interest from date, expressly made subordinate in payment to certain loans for development purposes. The only understanding disclosed is that no demand would be made for payment until 1934. There is no evidence indicating in any way that during the three years here involved the holders could not have demanded payment of both principal and accrued interest, irrespective of whether there were profits accrued, and compelled satisfaction out of the corporate assets, after provision to satisfy the outstanding obligations for development. Cf. *Commissioner* v. *Schmoll Fils Associated, Inc.*, 110 Fed. (2d) 611.

So we do not agree with respondent's added contention that the notes were, in effect, stock certificates with cumulative dividends payable from profits. They evidence a definite intent to create a debtor-

creditor relationship rather than a corporation-stockholder relationship and they have been consistently treated by the parties as valid and subsisting obligations of petitioner. *Palmer, Stacy-Merrill, Inc.*, 39 B. T. A. 636; *Tennessee Co.*, 40 B. T. A. 154.

Under ordinary circumstances, that notes in this large amount have not been paid either as to principal or interest would probably cast some reflection upon the bona fides of their issuance. However, the record contradicts any such reflection. At the time of the acquisition of the Ralph property and the issuance of these notes, oil from that field was selling at $4.30 per barrel. A drop in the market was not anticipated. However, after that time the price of oil from the Bradford field fell to $2 per barrel. If the higher price had been maintained, the oil actually produced during the period intervening between the time when these notes were issued and the date of the hearing herein would have brought gross receipts of more than $6,000,000. Such income was reasonably to have been anticipated when the notes were issued and, if actually received, not only interest on the notes could have been met, but a substantial reduction of their principal could have been effected.

On the whole record, we conclude that petitioner has established its right to a deduction of the interest accrued on the subordinate notes for each of the taxable years. See *Helvering* v. *Jane Holding Corporation, supra.*

The next issue is whether petitioner is entitled to depreciate the cost of drilling so-called "water wells," or whether it must recover these costs through its allowance for depletion. The evidence shows that the water wells are drilled, cased, and shot in exactly the same manner as oil wells. Their effect, when four of them are placed in the corners of a square in the center of which an oil well has been drilled, and thereafter filled with water under pressure, is to concentrate oil in the center well by means of the pressure exerted by the water through the oil sand. Petitioner urges that they constitute depreciable improvements within section 23 (m) of the Revenue Act of 1934. It is argued that respondent's regulations covering the point (Regulations 86, art. 23 (m)—1) refer only to gas and oil wells as depletable, which thus excludes "water wells" from that category.

This is a case of first impression, so far as we know. There seem to be no decisions as to whether costs of drilling these aids to production are to be treated in a manner different from the costs of drilling oil wells. Nevertheless, we believe that the principles enunciated in *United States* v. *Dakota-Montana Oil Co.*, 288 U. S. 459, cover the facts here and require a conclusion that the cost of drilling water wells is to be treated the same as the cost of drilling oil wells, in that such cost is recoverable only through the allowance for depletion.

In the *Dakota-Montana Oil Co.* case, the taxpayer contended that an oil well was an improvement and that, logically, there was no distinction for accounting purposes between the cost of the hole and the admittedly depreciable cost of buildings and machinery. The Government argued that a well was not a tangible physical property that would wear out with use and that its regulations accorded with the practice in the oil industry. The Court, holding for the Government, ruled that the question had been settled by a long and consistent administrative practice, regulatory provision for which was within the powers delegated to the Commissioner by the statute. This practice was to treat, as depreciable, tangible physical property, such as machinery, tools, equipment and pipe lines; and capital investment in the oil, including costs of development other than costs of physical property, drilling costs being considered as a development cost, were regarded as recoverable only through depletion allowances.

It is our opinion that the so-called "water wells" involved in this proceeding are sufficiently similar to oil wells to require the same tax treatment. A water well does not wear out with use as does physical machinery or a pipe line; it is drilled, cased and shot in the same manner as an oil well; and its sole value and function is to complement the oil well by causing the oil to concentrate in the area into which the oil well has been drilled. As such, we think, it is no more than a part of the oil well itself.

Having regard to the settled administrative practice of making a division between tangible physical property on the one hand and the well itself on the other, we hold that petitioner is not entitled to depreciation on the drilling costs of its water wells. See also *Petroleum Exploration* v. *Burnet*, 288 U. S. 467; *Burnet* v. *Jergins Trust*, 288 U. S. 508; *Simms Petroleum Co.*, 28 B. T. A. 1107; *J. S. J. Lyell*, 29 B. T. A. 133; and *Commissioner* v. *Hickman*, 68 Fed. (2d) 997.

In addition to petitioner's assertion of a right to deduct depreciation upon its cost of water wells, it has charged error in the determination of respondent in his failure to compute enough depreciation upon assets with respect to which there is no dispute as to their depreciable character or their cost. Petitioner contends that the rates used by respondent upon various assets are too low and asks that, in each case, a higher rate be used. In connection with this allegation of error, petitioner sets out the amount of depreciation upon each asset resulting from a use of the higher rate he asks to be used, but, in some instances, it happens that the amount of depreciation as computed by him by the use of the higher rate is less in amount than the depreciation computed by respondent by the use of a lower rate. It is quite evident that the computation

by petitioner was in error. That error appears to arise through application of the percentage rate to the depreciated balance of cost of the asset instead of to the original cost. In his answer, respondent, although not admitting the correctness of the rates for depreciation which the petitioner here asks, has made formal admission that the amounts computed by petitioner in those instances in which they are less than the amounts allowed in the determining of the deficiency are correct. Subsequently, at the hearing, petitioner abandoned the issue as to depreciation upon these assets other than water wells and respondent now takes the position that he is entitled to judgment upon the pleadings with respect to the particular items in question.

With this we can not agree. Since there appears to be no dispute as to the cost of each asset, the only real issue is the proper rate of depreciation to be used. The amount of the depreciation allowable is thus merely a mathematical calculation. We sustain respondent in his allowance of depreciation computed with the rates used by him. However, in recomputing the deficiency, depreciation should be allowed at those rates upon the actual cost of the various assets as established.

The last issue is whether petitioner is entitled to a credit under section 26 (c) (1) of the Revenue Act of 1936 by reason of a contract restricting the payment of dividends. The contract into which petitioner entered with three of its largest creditors provides that petitioner shall not declare any dividends until the indebtedness is discharged and that, if it pays any dividends before that condition is met, the notes representing the indebtedness shall become due and payable. At the close of 1936, the year to which the credit, if otherwise allowable, applies, petitioner owed these creditors $756,801.95 on development notes. Respondent argues that petitioner could have paid dividends without violating the contract, for the reason that the only consequence of so doing would have been to have made the notes immediately payable.

We do not so read the agreement. Had petitioner declared and paid a dividend, it would have violated the express agreement not to do so. This agreement had been exacted of it by its creditors as a condition for continuing the loans and making further ones. We think petitioner is entitled to this credit.

*Decision will be entered under Rule 50.*